UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

BRIANNA COLO, an individual,

               Plaintiff,

      v.

NS SUPPORT, LLC, an Idaho limited
liability company d/b/a Neuroscience
Associates,

               Defendant.

Case No. 1:20-CV-00437-DKG

**MEMORANDUM DECISION AND
ORDER RE: DEFENDANT'S
RENEWED MOTION FOR
DIRECTED VERDICT (DKT. 89)
AND DEFENDANT'S MOTION FOR
NEW TRIAL (DKT. 89-4);
FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
ISSUES OF BACK AND FRONT
PAY (DKT. 90)**

## INTRODUCTION

Plaintiff Briana Colo ("Colo") filed this action against Defendant NS Support,

LLC, d/b/a Neuroscience Associates, ("NSA"), alleging violations of the Civil Rights Act

of 1964 ("Title VII") and the Idaho Human Rights Act ("IHRA"). (Dkt. 18). Following

this Court's Memorandum Decision and Order Re: Motion for Summary Judgment (Dkt.

40), which granted Defendant's Motion for Summary Judgment (Dkt. 30), a jury trial was

held from September 26, 2022, through September 29, 2022, on Colo's sole remaining

retaliation claim. After deliberation, the jury returned a verdict on September 30, 2022, in

favor of Colo, awarding her $300,000 in back pay and $1,350,000 in front pay.[1] (Dkt. 85).

Pending before the Court are NSA's Renewed Motion for Directed Verdict (Dkt. 89) and Motion for New Trial (Dkt. 89-4), and Colo's Motion for Back Pay and Front Pay (Dkt. 90). The motions have been fully briefed and are now ripe for the Court's consideration. Having reviewed the entire record and the official trial transcripts lodged with the Court,[2] the Court finds the facts and legal arguments are adequately presented in the briefs and record. In the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions will be decided on the record before the Court. Dist. Idaho Loc. Civ. R. 7.1.

## FACTUAL AND PROCEDURAL BACKGROUND

Colo's employment with NSA was terminated on December 6, 2018. Colo claims she was wrongfully terminated from her employment in retaliation for preparing to report alleged workplace harassment and discrimination in violation of Title VII and the Idaho Human Rights Act.

On December 24, 2018, Colo filed a charge of discrimination with the Idaho Human Rights Commission ("IHRC"), and concurrently with the United States Equal

---

[1] The jury's back and front pay awards were advisory pursuant to Federal Rule of Civil Procedure 39(c)(1). (Tr. 647:6-21).

[2] After the trial, an official transcript was produced. The Court will cite to the transcript throughout this decision using the abbreviation "Tr."

Employment Opportunity Commission ("EEOC"), alleging sexual harassment, national origin discrimination, and retaliation. Thereafter, the IHRC and EEOC issued notices of right to sue.

Colo initiated this action on September 14, 2020. (Dkt. 1). On July 7, 2022, this Court entered an order granting in part and denying in part NSA's motion for summary judgment that dismissed her sexual harassment and national origin discrimination claims but found that disputes of material fact precluded entry of judgment on Colo's retaliation claim. (Dkt. 40). The relevant facts for purposes of deciding the instant motions, and as reflected in the Court's Memorandum Decision and Order Re: Motion for Summary Judgment (Dkt. 40) follow.

NSA is a neurosurgical clinic with offices in Boise and Meridian, Idaho. The clinic provides medical care to the patients of Drs. Michael Hajjar, Timothy Johans, Richard Lochhead, Thomas Manning, Paul Montalbano, and Kelly Bridges.[3]

NSA hired Colo in 2008 as a part-time receptionist; she later became a full-time surgery scheduler for Manning and worked in that position until her employment was terminated on December 6, 2018.

---

[3] Hajjar was the physician manager of NSA during the time of Colo's employment at NSA, and Manning was Colo's direct supervisor.

The events leading up to Colo's termination from employment began on October 5, 2018, when Hajjar became aware of a social media post Colo made about NSA and Lisa Jolliff, the Chief Operating Officer at NSA.[4]

The NSA physician leadership team met on October 18, 2018, to discuss the post. The consensus among the physicians was that the social media post was a terminable offense and that Colo's actions were overtly toxic, but Hajjar stated he did not want to terminate Colo's employment at that time. Instead, Hajjar wanted to have a "serious discussion" with Colo about her behavior in an effort to rehabilitate her relationship with NSA. To that end, a meeting between Hajjar, Manning, Jolliff, and Colo was scheduled for November 28, 2018.

The day before the scheduled meeting, on November 27, 2018, Colo spoke with her friend and co-worker, Kelly Roberts.[5] Colo contends she spoke to Roberts regarding her intent to report certain conduct by Montalbano to NSA's human resources department. At trial, Colo testified that during her discussion with Roberts, she explained that her concerns with Montalbano included him yelling "F'ing Mexicans," commenting on her appearance, asking where is that "F"ing Jew," in reference to Manning, and describing herself and another coworker of Hispanic heritage as "illegal aliens" while Montalbano's children were visiting the office. (Tr. 161:15-162:15). Colo also testified that she believed his comments violated the law and that she told Roberts she was

---

[4] Jolliff was also Colo's administrative supervisor.

[5] Roberts is a medical assistant at NSA working as a scheduler for Johans. Roberts was not Colo's supervisor during the events at issue.

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 4**

intending to make a report to human resources about his conduct. (Tr. 157:6-21; 163:24-164:1).

NSA disputes this. At trial, Roberts testified that she was not provided any details regarding the information Colo was gathering. Roberts testified that Colo "came over to chitchat like she does sometimes," and then: "In passing she had just said, oh, I have all this stuff on Dr. Montalbano, and then she went back to her area and back to work." (Tr. 143:21-23). Roberts testified that when she pressed Colo on what stuff she was referring to, Colo "didn't answer [her]." (Tr. 444:1-2). Roberts testified that Colo did not give her any idea or indication that she was going to be filing any kind of complaint or that she wanted Roberts to do anything with that information. (Tr. 445:8-25).

On November 28, 2018, Colo met with Hajjar, Manning, and Jolliff. The parties dispute what transpired during the meeting. Colo alleges the issue regarding the social media post was "resolved" and that "no other issues were raised or discussed." NSA contends that Colo was specifically asked if she had any concerns about the workplace that she wanted to discuss or bring up, but Colo said there was nothing. At trial, Colo testified that the reason she did not voice her complaints about Montalbano to Jolliff, Manning, or Hajjar at the November 28th meeting was because she feared she would be retaliated against. (Tr. 159:21-160:4).

At the conclusion of the meeting, everyone agreed to move forward together with a "fresh start" and a "clean slate." The day after the meeting, on November 29, Montalbano put his arm on Colo's shoulders and back and began rubbing her back. (Tr.

160:24-161:14; 163:19-23). Colo testified that she intended to report this conduct at a later time. (Tr. 161:10-14; 163:19-23).

On November 30, 2018, Roberts informed Jolliff of her conversation with Colo. (Tr. 365:2-12). Later that day, Jolliff told Manning about the information she received from Roberts. (Tr. 365:18-366:4); (Ex. 210). In response, Manning stated, "[W]e all need to be careful and watch what we say and do." (Ex. 210).

On December 4, 2018, Jolliff informed Hajjar about the information she received from Roberts. (Ex. 210); (Tr. 366:13-19). Hajjar testified that they did not know what information Colo was compiling. (Tr. 389:1-3; Tr. 400:17-19).

On December 6, 2018, after a unanimous vote from the physician partners, excluding Manning, Colo was terminated from her employment at NSA. (Tr. 396:7-19). No disciplinary actions occurred between the November 28th meeting and Colo's termination on December 6, 2018.

The parties dispute the basis for Colo's termination. Colo contends she was terminated from her position in retaliation for preparing to report Montalbano's conduct to human resources, while NSA maintains Colo was terminated based upon a history of behavioral problems and negative attitude, her insubordination to a supervisor, and pursuant to the bylaws in the employee handbook.

Following her termination, Hajjar sent Manning an email informing him of the circumstances surrounding NS Support's decision to terminate Colo. Hajjar's email states as follows:

My first and probably foremost role in this position is to promote the health and well being of the general partners . . . .

…

On Friday, November 30, it was brought to the attention of Lisa [Jolliff] that Bri [Colo] was compiling information against one of the partners to use against them by another NSA employee. We specifically told Bri at the Thursday meeting that if she has any concerns about the workplace, please bring them to you or me. No concern was ever mentioned about any interaction.

Lisa brought this to your attention late last week. You did not bring this to me or address the issue about any complaints, specificity, or what happened. I was informed about this on Tuesday December fourth by Lisa and called an emergency meeting that did not include you because there was a unanimous lack of faith vote about your handling of this issue.

Based on our bylaws as stated in the handbook, including failure to follow clinic policy and acting insubordinate to a supervisor, there was a unanimous vote to immediately terminate Brianna.

(Ex. 209).

At trial, when asked about this email, Hajjar testified that NSA does not "tolerate threats against any of the employees, any of the people that are part of the organization, whether they be partners or staff." (Tr. 399:10-13). Hajjar surmised that Colo's indication that she was "going after" one of the partners was a "threat" that could entail "legal action." (Tr. 399:17-400:19).

Colo never reported an incident of inappropriate conduct or behavior by Montalbano pursuant to the process set forth in NSA's employee handbook during her employment.

Trial began on September 26, 2022. Neither party lodged any formal objections to the Court's jury instructions.[6] The jury found that NSA unlawfully retaliated against Colo

---

[6] NSA did, however, object to the verdict form. (Tr. 661:21-23).

in violation of Title VII and the IHRA, awarding back pay damages in the amount of $300,000 and front pay damages in the amount of $1,350,000. (Dkt. 85). The jury's back and front pay awards were advisory. (Tr. 647:6-21).

After trial, the parties stipulated to a schedule for filing motions before the Court entered judgment on the verdict. The parties filed their respective motions on December 7, 2022, and briefing was completed on December 28, 2022. Having reviewed the motions and supporting materials, the trial transcripts, and the entire record, the Court finds as follows.

## DISCUSSION

### 1. NSA's Renewed Motion for Directed Verdict

At the close of Colo's case-in-chief, NSA made a Rule 50(a) motion. (Tr. 401:9-402:4). After reviewing the parties' briefing and hearing oral argument, the Court denied the motion, (Tr. 410:4-417:12), and NSA presented its case-in-chief.

At the close of NSA's presentation of evidence, NSA renewed its motion under Rule 50(a). (Tr. 643:1-3). The Court deferred ruling on the motion, (Tr. 643:8-9), and the case was submitted to the jury, resulting in a verdict in Colo's favor, (Dkt. 85). At the Court's request, the parties submitted briefing on NSA's Rule 50(b) motion. (Dkts. 89-4, 93-1, 94). For the reasons that follow, the Court will deny the motion.

#### a. Legal Standard

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Under Rule 50(a), a party must first move for judgment as a matter of law before the case is submitted to the jury and "specify...the law and facts that entitle the movant to the

judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if the Court denies the pre-verdict motion, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "A posttrial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b), advisory committee's note to 1991 amendment.

The Court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal citations omitted). "A jury's verdict must be upheld if it is supported by substantial evidence...even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *see also E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

"[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

### b.  Analysis

At trial, Colo had the burden of proving each of the following elements of her

retaliation claim by a preponderance of the evidence:

1.  The plaintiff participated in an activity protected under federal law; that
    is, she made an informal or formal complaint regarding unlawful
    employment practices; and,

2.  The defendant subjected the plaintiff to an adverse employment action,
    that is termination; and,

3.  The plaintiff was subjected to the adverse employment action because of
    her participation in a protected activity.

(Tr. 678:2-14). Because the second element was not at issue, (Dkt. 40 at 23); (Tr. 404:13-

17), the Court considers only whether the first and third elements of Colo's claim were

supported by substantial evidence.

### i.  First Element – Protected Activity

As to the first element, while NSA asserts that Colo did not engage in a protected

activity until *after* she was terminated when she filed a Charge of Discrimination with the

IHRA and EEOC in January 2019, (Dkt. 89-5 at 7), the Court finds there was substantial

evidence from which a jury could conclude that Colo engaged in a protected activity in

November 2018 when she informally complained to her coworker, Roberts, about her

intent to report what she believed to be illegal conduct to human resources.

An employee's formal or informal complaint regarding unlawful employment

practices is a "protected activity," and a plaintiff need only show that her belief that an

unlawful employment practice occurred was "reasonable." *See Passantino v. Johnson &*

*Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Moyo v. Gomez*, 40

F.3d 982, 985 (9th Cir. 1994). Moreover, the Ninth Circuit has recognized that the EEOC interprets an employee's opposition "broadly" to include an employee's threat to file a charge. *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 n.2 (9th Cir. 1978) (citing EEOC Compliance Manual, 704(a) Discrimination, § 492.1(a) (P 6951) (1975)); *see also* EEOC Enforcement Guidance on Retaliation and Related Issues (2016) (available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues) ("[I]t may be a reasonable manner of opposition to inform others of alleged discrimination, including …coworkers ….").

At trial, Colo testified that during her discussion with Roberts, she explained that her concerns about Montalbano's conduct included instances of him yelling "F'ing Mexicans," commenting on her appearance, asking where is that "F"ing Jew," in reference to Manning, and describing herself and another coworker of Hispanic heritage as "illegal aliens" while Montalbano's children were visiting the office. (Tr. 161:15-162:15). Colo also testified that she believed his comments violated the law and that she told Roberts she was intending to make a report to human resources about his conduct. (Tr. 157:6-21; 163:24-164:1).

While Roberts testified that Colo told her she "ha[d] all this stuff on Dr. Montalbano" and indicated that she didn't "have any idea what stuff [Colo] might be gathering," (Tr. 443:19-444:10), the jury was not required to believe Roberts's version of events. Instead, based upon the evidence presented and viewing it in the light most favorable to Colo, as it must, *see Go Daddy Software, Inc.*, 581 F.3d at 961, the Court finds that Colo presented substantial evidence from which a reasonable jury could find

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 11**

that she met her burden of proving the first element of her retaliation claim, *i.e.*, that she made an informal complaint to Roberts about her intent to report what she believed to be illegal conduct on the part of Montalbano to human resources.

NSA makes much of the Ninth Circuit's holdings in *Bullen v. Session*, 716 F. App'x 582 (9th Cir. 2017) and *Morgan v. Buttigieg*, No. 21-15979, 2022 WL 1566976 (9th Cir. May 18, 2022), asserting that these cases require the Court to find in its favor. The Court is unpersuaded, however, and finds both *Bullen* and *Morgan* to be distinguishable from the case at bar.

First, in *Bullen*, the Ninth Circuit determined that although Bullen had clearly suffered from "several adverse [employment] actions," including a demotion, he had failed to direct the court to evidence showing that he engaged in a protected activity before these adverse employment actions took place. 716 F. App'x at 583-84. Specifically, the court noted that while Bullen provided evidence that (a) he told his supervisor that he disagreed with a hiring decision, and (b) he told his coworker that he supported the coworker's decision to file an EEO complaint,[7] his complaint to his supervisor was not about discrimination, and his supervisor was never made aware of his support for his coworker's EEO complaint. *Id.* at 584.

---

[7] Bullen apparently "supported his coworker's decision to file an EEO complaint" by providing testimony in support of that complaint. *Bullen v. Lynch*, No. 2:13-CV-01349-TMB, 2016 WL 10880152, at *2 (D. Ariz. Mar. 31, 2016), *aff'd sub nom. Bullen v. Sessions*, 716 F. App'x 582 (9th Cir. 2017).

In its briefing, NSA focuses on Bullen's private support for his coworker, arguing that *Bullen* stands for the proposition that "informal private discussions amongst nonsupervisory coworkers, as occurred here, do not qualify as protected activity." (Dkt. 89-5 at 9). Read in context, however, *Bullen* does not stand for this proposition. Rather, based on the facts at issue, *Bullen* affirms the Ninth Circuit's holding in *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793 (9th Cir. 1982), concerning the third element of a retaliation claim, that the plaintiff "present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." 686 F.2d at 796. Here, unlike in *Bullen*, competent evidence was presented that Colo complained to Roberts about Montalbano's allegedly unlawful conduct—conduct that she believed violated the law. And, as discussed at length below, the Court finds that substantial circumstantial evidence was presented that the decisionmakers at NSA were aware of the substance of Colo's complaint.

Second, in *Morgan*, the Ninth Circuit affirmed the trial court's conclusion that Morgan had not engaged in a protected activity where he "could not reasonably and in good faith have believed that his coworker's isolated comment was discriminatory, let alone an unlawful employment practice under Title VII." 2022 WL 1566976, at *1. While the Ninth Circuit did note that it was "not persuaded that an employee's vague statement that he is 'considering filing an EEO complaint,' absent other facts, is enough in itself to establish protected participation," *id.* at *1 n.1, this holding was rendered in light of the circumstances of Morgan's report to his coworker as a whole and the questionable nature of his complaint. Here, unlike in *Morgan*, competent evidence was

presented at trial that (1) Colo told Roberts about Montalbano's allegedly unlawful conduct, which included negative statements about her national origin; and (2) Colo personally believed Montalbano's conduct to be unlawful. Accordingly, *Morgan*, read within context, does not stand for the proposition that a plaintiff cannot be seen to have engaged in a protected activity where he or she considered filing an EEO complaint. *See also Silver*, 586 F.2d at 141 n.2. Accordingly, the Court is not persuaded that *Bullen* and *Morgan* require the Court to find in favor of NSA on its Rule 50 motion.

### ii.  Third Element – Causation

Once it has been shown that the plaintiff engaged in a protected activity, the third element requires that the plaintiff "present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen*, 686 F.2d at 796 (citations omitted). A plaintiff may establish a causal link between the protected activity and the adverse action by circumstantial evidence, including the employer's knowledge of the protected activity and a proximity in time between the protected action and the adverse employment act. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986)); *see also Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). The Ninth Circuit has recognized that "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

Here, Colo's conversation with Roberts took place on November 27th, the day before Colo's meeting with Jolliff, Manning, and Hajjar occurred on November 28th. (Tr. 442:19-444:10); (Tr. 536:23-537:11). Colo testified that the reason she did not voice her complaints about Montalbano to Jolliff, Manning, or Hajjar at the November 28th meeting was because she feared she would be retaliated against. (Tr. 159:21-160:4).

Colo was terminated on December 6, 2018. (Tr. 165:6-16). The only events to transpire between the November 28th meeting and Colo's termination were (1) Joliff's conversation with Manning, who, when he was told of Colo's conversation with Roberts, responded, "[W]e all need to be careful and watch what we say and do," (Ex. 210); (Tr. 365:18-366:1); and (2) Jolliff's conversation with Hajjar, who, when he was told of Colo's conversation with Roberts, testified that he considered Colo's indication that she was "going after Dr. Montalbano" to be a threat to his partner, and surmised that the threat could be legal action, (Tr. 399:7-400:19)[8]; (Ex. 209).

---

[8] Specifically, Dr. Hajjar testified as follows:

**Q.· ·The second full paragraph indicates that, "If any similar employee committed similar actions against you," meaning Dr. Manning, "including ones I have known forever, I would take the same action as was done today"; is that correct?**

A.· ·That's correct.

**Q.· ·Okay.· And so what action – similar actions are you talking about in this paragraph committed by an employee?**

A.· ·At our company, we don't tolerate threats against any of the employees, any of the people that are part of the organization, whether they be partners or staff.· And I take these situations very personally and very seriously so that if any member of our staff is threatened by another member of the staff, we can't have that.

**Q.· ·Okay.· Was there a threat by Ms. Colo?**

A.· ·Well, the specific threat that was stated before, that she is going after somebody.· It doesn't matter.· It's a partner.

**Q.· ·Okay.· Do you know what the threat is?**

(Continued)

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 15**

NSA maintains its decisionmakers did not know the substance of Colo's complaint to Roberts and therefore could not have known that Colo had engaged in a protected activity, (Dkt. 89-5 at 18-21), asserting that the Ninth Circuit requires "actual knowledge" of the substance of the protected activity based on *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. 2003). In *Raad*, the Ninth Circuit held that "the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." 323 F.3d at 1197 (9th Cir. 2003). While knowledge itself is certainly required, the evidence itself need not be direct; rather, evidence from which an inference may be drawn is sufficient. *Id.*

---

      A.· ·No.

      **Q.· ·Did you take --**

      A.· ·Excuse me.· The threat as far as what Ms. Colo is threatening the person, or what the allegation was?· I don't understand, and I want to make sure I get your question.

      **Q.· ·Okay.· And I'm using your word, "threat."· That did not come from me. You perceived there was a threat against somebody at the office?· And I'm assuming that is Dr. Montalbano.**

      A.· ·Well, the term "going after" doesn't have any other connotation to me other than a threat.

      **Q.· ·Okay. But as you sit here today, you don't know what concerns she was going to address?**

      A.· ·Well, how about legal action?

      **Q.· ·Okay.**

      A.· ·We're here.

      **Q.· ·But you don't know? You're just guessing at this point?**

      A.· ·I don't know anything about the allegations or the threat other than the fact that there was a threat.

(Tr. 399:1-400:19).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 16**

Here, in accordance with the Ninth Circuit caselaw, the Court finds that the proximity in time between Colo's informal complaint to Roberts, considered together with the circumstances surrounding her termination—specifically, Roberts' conversation with Jolliff, Jolliff's conversations with Manning and Hajjar, Hajjar's email to Manning, and the absence of any other disciplinary action between the November 28th meeting and her termination on December 6th—as well as the close proximity in time between Colo's complaint and her termination, constitutes substantial evidence from which a jury could infer (1) that NSA had knowledge of the substance of Colo's complaint, and (2) that there was a causal connection between Colo's engagement in a protected activity and her subsequent termination. *See Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) ("The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'" (quoting *Yartzoff*, 809 F.2d at 1376)); *see also Passantino*, 212 F.3d at 507 ("[W]hen adverse decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").

Ultimately, the Court finds Colo presented substantial evidence from which a reasonable jury could conclude that she was terminated because of her participation in a protected activity. Based upon this evidence, viewing it in the light most favorable to Colo, and drawing all inferences in Colo's favor, the Court finds that the jury could have reasonably concluded—and did, in fact, conclude—that NSA retaliated against Colo in

violation of Title VII and the IHRA. The Court will therefore deny NSA's Rule 50 Motion.

### 2. NSA's Motion for New Trial

#### a. Legal Standard

Federal Rule of Civil Procedure 59(a) governs a request for a new trial. It provides, "A new trial may be granted … in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). "Historically, recognized grounds include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotations marks and citation omitted). A new trial may be granted only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice. *Id.*; *Passantino*, 212 F.3d at 510 n.15.

Unlike a Rule 50 motion, whereby the Court must refrain from "mak[ing] credibility determinations or weigh[ing] the evidence," *Go Daddy Software, Inc.*, 581 F.3d at 961, a Rule 59 motion permits the Court to assess the credibility of the witnesses, *see Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam). A new trial may also be granted if the Court concludes that a party was prejudiced by erroneous evidentiary decisions or by some other unfairness in the trial. S*ee Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

"Although a court need not consider the evidence in a manner that favors the prevailing party and it may grant a new trial even if there is some evidence in support of the prior decision, it should not grant a new trial unless it more than simply disagree[s] with the verdict." *Gates v. Boyle*, No. CV 05-59-M-DWM, 2007 WL 9710298, at *1 (D. Mont. Mar. 15, 2007) (internal quotation omitted).

Indeed, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted). "Nonetheless, a new trial is appropriate where the court has a firm conviction of the jury's error and an attendant miscarriage of justice." *Gates*, 2007 WL 9710298, at *1 (internal quotations omitted).

### b. Analysis

NSA moves for a new trial on two grounds: (i) the Court erred in admitting the IHRC Determination into evidence; and (ii) the Court erred in permitting Colo to testify to out-of-court statements made by Manning. (Dkt. 89-1 at 1-2). For the reasons that follow, the Court will deny NSA's Rule 59 Motion.

### i. The IHRC Determination Was Properly Admitted into Evidence

NSA advances three reasons in support of its assertion that it was error for the Court to admit the IHRC Determination into evidence, none of which the Court finds availing: (1) *Plummer* and its progeny do not require IHRC Determinations to be admitted indiscriminately; (2) the IHRC Determination, on the whole, is unreliable; and

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 19**

(3) the Court's limiting instruction failed to address the legal conclusions and

misstatements of law contained in the IHRC determination. (Dkt. 89-1).

### 1.  The IHRC Determination Is Per Se Admissible Under *Plummer*

In *Plummer v. Western International Hotels Co.*, the United States Court of

Appeals for the Ninth Circuit held that probable cause determinations are per se

admissible. 656 F.2d 502, 506 (9th Cir. 1981) ("[A] plaintiff has a right to introduce an

EEOC probable cause determination in a Title VII lawsuit, regardless of what other

claims are asserted, or whether the case is tried before a judge or jury."); *see also Sanders*

*v. Univ. of Idaho, Coll. Of L.*, No. 3:19-CV-00225-BLW, 2002 WL 5257714, at *5 (D.

Idaho Oct. 5, 2022) ("The Ninth Circuit has held that an EEOC determination of probable

cause is per se admissible." (citing *Plummer*, 656 F.2d at 506)). The Ninth Circuit later

indicated that "the *Plummer* ruling is not restricted solely to EEOC findings of probable

cause but extends to similar administrative determinations …." *Heyne v. Caruso*, 69 F.3d

1475, 1483 (9th Cir.1995). Based on the Ninth Circuit's "mandate," the District of Idaho

has held "that probable-cause determinations by the EEOC and other similar

determinations be admitted into evidence" in part, because probative nature "of the

probable-cause determination far outweigh[s] the prejudicial effect it may have on a

jury." *Garcia v. PSI Env't Sys.*, No. 1:10-CV-00055-EJL, 2012 WL 2359496, at *1 (D.

Idaho June 20, 2012) (citing *Heyne*, 69 F.3d at 1483). Further, "even in the absence of

*Plummer*, the Court [was] not persuaded that the prejudicial effect of the probable-cause

determination outweighs its probative value." *See id.* Once the determination has been

introduced, "[t]he defendant … is free to present evidence refuting the findings of the EEOC and may point out deficiencies in the EEOC determination," which "go[es] to the weight to be given by the trier of fact to the EEOC determination." *Plummer*, 656 F.2d at 505 n.9.

### a. The Ninth Circuit Has Not Adopted a Discretionary Approach to the Admission of Administrative Determinations

In support of its argument that the Court should have exercised its discretion to exclude the IHRC Determination, NSA points to decisions of other circuits that have expressly rejected the Ninth Circuit's per se admissibility rule for administrative determinations in favor of a discretionary approach. *See Shotwell v. Donahoe*, 85 P.3d 1045, 1049 (Ariz. 2004) (noting that while the Ninth Circuit "is the only circuit that employs the per se admissibility rule," the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh circuits have rejected the per se admissibility rule in favor a discretionary standard). *Plummer*, however, is binding Ninth Circuit precedent that the Court cannot and will not ignore. Thus, the Court stands by its decision to admit the IHRC Determination based on the Ninth Circuit's holding in *Plummer*.[9]

---

[9] As explained in its Memorandum Decision and Order on Defendant's Second Set of Motions *in Limine* (Dkt. 72), the Court permitted Plaintiff to introduce only those portions of the IHRC's determination that concerned her claim for retaliation. As the decisions of other district courts within the Ninth Circuit indicate, this was appropriate. *See Finley v. United Parcel Service Inc.*, No. CV16-00055-PHX-ROS, 2018 WL 6421693, at *1 (D. Ariz. June 5, 2018) (limiting the introduction of the EEOC determination to include only those claims at issue during trial).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 21**

### b. The IHRC Determination Is Admissible under the Federal Rules of Evidence

Next, while NSA acknowledges that the IHRC Determination may be considered as evidence under the public records exception to the rule against hearsay, *see* Fed. R. Evid. 803(8)(A)(iii), (B) ("[A] record or statement of public office [is admissible] if[] it sets out[] in a civil case … factual findings from a legally authorized investigation; and [] the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."),[10] NSA asserts that it was improperly admitted because it contains multiple layers of inadmissible hearsay and inappropriate opinion testimony.[11] The Court finds these arguments unavailing for several reasons.

### i. *Hearsay within Hearsay*

Concerning the multiple layers of inadmissible hearsay, NSA takes issue with two out-of-court statements contained in the IHRC Determination: (1) Hajjar's statements to the physician partners that the issue regarding Colo had been resolved at the November 28th meeting; and (2) Manning's conversation with the NSA partners regarding Colo's termination. (Dkt. 89-1 at 9). Colo asserts that both Hajjar's and Manning's statements are non-hearsay under Federal Rule of Evidence 801. (Dkt. 93 at 4-5).

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

---

[10] The Court addresses NSA's untrustworthiness argument in Part 2.b.i.2.

[11] NSA also asserts that the IHRC Determination is inadmissible because it contains misstatements of law. (Dkt. 89-1 at 15). The Court will address this argument *infra* in Part 2.b.i.2.

Under Federal Rule of Evidence 801, an opposing party's statement is not hearsay if:

> The statement is offered against the opposing party and:
>
>> (A) was made by the party in an individual or representative capacity;
>> (B) is one the party manifested that it adopted or believed to be true;
>> (C) was made by a person whom the party authorized to make a statement on the subject; [or]
>> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]

Fed. R. Evid. 801(d)(2)(A)-(D).

As to the statements made by Hajjar, they are admissible under Rule 801(d)(2)(A), (B), (C), and (D). Hajjar, as the managing partner of NSA at the time he relayed the information about the results of the November 28th meeting to the rest of the physician partners, was representing NSA, as provided for by Rule 801(d)(2)(A); authorized by NSA to make a statement on the subject, as provided for by Rule 801(d)(2)(C); and was an agent and/or employee of NSA at the time he made the statement concerning matters within the scope of his employee/agency relationship with NSA as it then it existed, as provided for by Rule 801(d)(2)(D). Furthermore, Hajjar's statements concerning the results of the November 28th meeting are undisputed by NSA as having actually occurred, as provided for by Rule 801(d)(2)(B).

As to Manning's conversation with the NSA partners concerning Colo's termination, the IHRC Determination indicates that Manning did not describe any specific statements made by the NSA partners regarding Colo's termination to the Commissioner; he only provided his opinion that he "never received an adequate

response." (Ex. 203). The fact that a conversation concerning Colo's termination

occurred between Manning and others at NSA is not an out of court statement being

offered for the truth of the matter. Fed. R. Evid. 801(c) ("'Hearsay' means a statement

that [] the declarant does not make while testifying at the current trial or hearing; and [] a

party offers in evidence to prove the truth of the matter asserted in the statement.").

Rather, the only "statement" contained in the IHRC Determination concerning this matter

is Manning's statement to the investigator, which, as NSA acknowledges, is excepted

from the rule of hearsay. (Dkt. 89-1 at 9 (citing Fed. R. Evid. 803(8)(A)(iii))).

### ii. *Opinion Testimony*

NSA also takes issue with a statement Colo made to the IHRC Commissioner

concerning her beliefs about the reason for her termination. (Dkt. 89-1 at 10).

Specifically, NSA asserts that Colo's statements to the Commissioner constitute improper

lay witness opinion under Federal Rule of Evidence 701. (*Id.*) Colo's statements to the

Commissioner are reflected in the IHRC Determination as follows:

> [Colo] further states that in the November 28, 2018, meeting she was told
> that she was a valued employee and being given a "fresh start" and that NS
> Support hoped she would work for them for another forty years. She believes
> this is proof that, had NS Support not become aware of her intentions to
> report Dr. Montalbano, it would not have terminated her employment due to
> any of the other reasons stated.

(Ex. 203).

Federal Rule of Evidence 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion
> is limited to one that is:
>> (a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

While NSA is generally correct that testimony based purely on speculation is inadmissible and should be excluded, *see, e.g.*, *United States v. Torralba-Mendia*, 784 F. 3d 652, 658 (9th Cir. 2015), lay opinions may be admissible if the opinion is rationally based on personal perceptions of events or conduct, and if it is helpful to the trier of fact, Fed. R. Evid. 701.

Here, Colo's statements satisfy both criteria for three reasons. First, based on NSA's representations to Colo at the November 27th meeting, which NSA does not dispute, Colo appropriately perceived that she would have continued working for NSA for another forty (40) years had they not been informed of her intent to report Montalbano's conduct, and her statement to the IHRC Commissioner reflects that perception. Second, causation is the third element of Colo's retaliation claim and is based upon disputed facts that were to be determined at trial. Although Colo did not provide oral testimony about this matter at trial, both her perception of the events that transpired and her theory of the case are relevant to the jury's ultimate determination of the third element of her retaliation claim. And third, because Colo provided this testimony to the Commissioner in furtherance of his investigation into her Title VII and IHRA claims, it is therefore admissible under Federal Rule of Evidence 803(8)(A)(iii). Accordingly, Colo's statements to the IHRC Commissioner during the course of his investigation constitute

proper lay witness opinion under Federal Rule of Evidence 701 and were otherwise properly admitted under Rule 803(8)(A)(iii).

Based upon the foregoing, the Court concludes that the IHRC Determination did not contain inadmissible hearsay within hearsay under Rule 805 or improper opinion testimony under Rule 701. Thus, the IHRC Determination was appropriately admitted into evidence on these bases.

### 2. NSA Has Not Shown the IHRC Determination is Unreliable

Next, NSA asserts that the IHRC Determination should have been excluded under Federal Rule of Evidence 803(8)(B) because it is unreliable. (Dkt. 11-17).

In evaluating the trustworthiness of a report submitted into evidence, the trial court begins with a presumption that the disputed report is trustworthy. *See Montiel v. City of L.A.*, 2 F.3d 335, 341 (9th Cir.1993); *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992); *see also* Fed. R. Evid. 803(8)(A)(iii), (B) ("[A] record or statement of public office [is admissible] if[] it sets out[] in a civil case … factual findings from a legally authorized investigation; and [] the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."). Because the court assumes that "public officials perform their duties properly without motive or interest other than to submit accurate and fair reports," the party opposing the introduction of the evidence must present "enough negative factors to persuade [the] court that [the] report should not be admitted." *Johnson*, 982 F.2d at 352-53 (quoting

*Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986)).

Here, too, NSA advances three arguments in support of its assertion that the IHRC Determination is untrustworthy, none of which prevail.

First, NSA asserts that the IHRC Determination is unreliable because it contains misleading and inaccurate statements of law. (Dkt. 89-1 at 16). However, NSA misunderstands the Court's role in assessing the trustworthiness of the IHRC Determination. "The role of the court in determining trustworthiness is not to assess the report's credibility, but to evaluate whether the report was compiled or prepared in a way that indicates its reliability." *Hedgepeth v. Kaiser Found. Health Plan of Northwest*, 76 F.3d 386, 1996 WL 29252, at *2 (9th Cir.1996) (unpublished table disposition) (citing *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1305–08 (5th Cir. 1991)). The "misleading and inaccurate statements of law" of which NSA complains have little to do with the IHRC's methods of compiling the report. Rather, as addressed at length *infra*, these issues go to the overall weight the finder of fact should have assigned to the IHRC Determination based upon the Court's instruction regarding the proper burden of proof to be applied to Colo's retaliation claim.

Next, NSA asserts that because other circuits have recognized that EEOC determinations "vary greatly in quality and factual detail," the IHRC Determination is "utterly unreliable." (Dkt. 89-1 at 15 (citing *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984))). While the Ninth Circuit has certainly acknowledged that administrative determinations do vary in quality and detail, *see Coleman v. Quaker*

*Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) (EEOC letters "are not homogenous products; they vary greatly in quality and factual detail" (citing *Yellow Freight System*, 734 F.2d at 1309)), NSA has not put forth "enough negative evidence" to convince this Court that this particular IHRC Determination was severely lacking in quality or detail. Moreover, the EEOC Determination at issue in *Coleman* is wholly unlike the IHRC Determination at issue here. In *Coleman*, the Ninth Circuit noted that because the EEOC Determination "stated simply" the Commission's conclusion that there was reasonable cause to believe a violation had occurred under the ADEA, "[i]t [was] impossible from this letter to know what facts the EEOC considered and how it analyzed them." *Id.* Thus, the *Coleman* Court appropriately excluded the determination because it concluded that the determination contained nothing more than "'bare conclusions' … [that] have little probative value." *Id.* Here, however, the IHRC Determination presented to the jury contained a robust discussion of each party's position and the facts the Commissioner considered in reaching his conclusion that there was probable cause to believe a violation had occurred. (Ex. 203). It is therefore not the kind of evidence over which the Ninth Circuit has expressed appropriate concern.

Finally, NSA argues that the IHRC's investigation was "perfunctory and one-sided" because only one NSA physician was interviewed throughout the entirety of the investigation. (Dkt. 89-1 at 16). However, the IHRC Determination states that NSA submitted sworn statements from nine separate NSA employees; it incorporates multiple statements summarizing NSA's position and supporting evidence; and it refers to specific

claims made by NSA's employees, including Jolliff and Roberts—all of which demonstrate that the investigation was far from one-sided. (Ex. 203).

After reviewing the IHRC Determination in its entirety, the Court is unpersuaded by NSA's arguments that the IHRC Determination is unreliable. Even if the IHRC Determination were as one-sided as NSA suggests, the information contained therein is wholly consistent with the evidence presented at trial. More still, NSA has not suggested that the IHRC "failed to perform '[its] duties properly without motive or interest other than to submit accurate and fair reports.'" *See Gilbrook*, 177 F.3d at 858–59 (citing *Johnson*, 982 F.2d at 352-53). Nor has it pointed to any serious or pervasive inconsistencies within the report that would justify its exclusion. *See, e.g.*, *Garcia*, 2012 WL 2359496, at *3 (upholding introduction of IHRC Determination even where defendants alleged it was "'rife with inaccuracies" because the inaccuracies were minor, "d[id] not pervade the report," and, even where they were "more significant," they were not "so serious as to convince the Court that the report is not trustworthy").

Ultimately, the Court finds that NSA has not presented "enough negative factors" to persuade this Court that the IHRC Determination is unreliable or untrustworthy. Accordingly, the Court is satisfied that the IHRC Determination is reliable and was properly admitted under Federal Rule of Evidence 803(8)(A)(iii), (B).

### 3.   The Court Instructed the Jury on the Proper Legal Standard to be Applied to Each Element of Colo's Retaliation Claim

Lastly, NSA contends that the Court inadequately instructed the jury regarding the legal conclusions and misstatements of law contained in the IHRC Determination.[12] (Dkt. 89-1 at 17-19).

Specifically, NSA asserts that the Court's limiting instruction did not adequately address the "misleading and inaccurate statements of law contained within the Determination." (Dkt. 89-1 at 17). However, the jury was clearly instructed to apply the appropriate standard of proof to each element of Colo's retaliation claim. (Tr. 677:23-25, 678:1-14) (Colo has the burden of proving each element of her retaliation claim by a preponderance of the evidence); (Tr. 677:8-14) (defining the preponderance of the evidence standard). And, the following instruction was given to the jury concerning the IHRC Determination:

> A probable cause determination from the IHRC is not a determination that an employer has violated Title VII or the Idaho Human Rights Act. Instead, it is a preliminary conclusion that there is reason to believe that a violation has taken place. You may consider the IHRC's Determination as you weigh

---

[12] NSA did not object to this particular instruction at trial. (Tr. 661:21-22 ("We don't have any objection to the jury instructions.")). Pursuant to Federal Rule of Civil Procedure 61, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Typically, a party may only claim error to the admission of evidence if the error "affects a substantial right" and the party, "on the record[] timely objects or moves to strike." Fed. R. Evid. 103(a)(1)(A). However, the Court, in its discretion, "may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved." Fed. R. Evid. 103(e). While the Court does not find that plain error affecting NSA's substantial rights occurred here, the Court will nevertheless address NSA's arguments.

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 30**

all of the evidence in this case, but the decision as to whether the defendant violated the law is yours alone.

(Tr. 681:11-20).

These instructions, considered together, demonstrate that the jury was not prevented from "independently evaluating the evidence and from reaching its own conclusion as to whether a violation of the Act[s] occurred," as the Ninth Circuit requires. *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1501 (9th Cir. 1986). Accordingly, the Court stands by its limiting instruction, which, consistent with Ninth Circuit caselaw, instructed the jury that while they "may consider the IHRC's determination as [they] weigh all of the evidence in this case, ….·the decision as to whether the defendant violated the law is [theirs] alone." (Tr. 681:17-20); *Gilchrist*, 803 F.2d at 1500–01.

Accordingly, the Court finds the jury was properly instructed on the appropriate standard of proof to be applied to each element of Colo's retaliation claim.

## ii. Manning's Statements to the IHRC Commissioner Are Not Hearsay

Finally, NSA asserts that a new trial is warranted due to the Court's error in admitting several of Manning's out-of-court statements contained in the IHRC Determination as non-hearsay admissions of a party opponent. Specifically, NSA asserts that although Manning made these statements in his capacity as a physician partner with

an ownership interest in NSA, this does not automatically render him a party opponent

for purposes of Federal Rule of Evidence 801(d)(2).[13] (Dkt. 89-1 at 19).

> In his interview with the Commissioner, Manning
>
> confirmed Colo's description of the meeting on November 28, 2018, and recalled that Dr. Hajjar, physician president, reported back to the physician partners that the issue had been resolved satisfactorily. [Manning] recalled that the issue was considered "water under the bridge," and they would not worry about it going forward. When asked about the reason for Colo's termination, Manning stated he was not privy to the discharge. Following her termination, when [Manning] asked for a reason, he "never received an adequate response." [Manning] declined to speculate on the reason for [Colo's] termination. [Manning] had no knowledge of any dress code or other misconduct discipline or coaching.

(Ex. 203 at 5).

As set forth above, "Rule 801(d)(2)(D) sets forth three elements necessary for

admitting a statement that would otherwise be excluded as hearsay: (1) the statement

must be made by an agent or employee of the party against whom the statement is being

offered; (2) the statement must concern a matter within the scope of that employment

relationship; and (3) the statement must be made while the declarant is yet employed by

---

[13] In a footnote, NSA asserts that some "examples" of the testimony Colo was permitted to testify to concerning included: (1) her recollection of Manning's response when she informed him of her termination, (Tr. 177:25-179:3) ("He was shocked. He was very upset, very emotional."); and (2) Manning's discussion with her of NSA's PTO policy, (Tr. 219:25-221:4).

First, concerning Colo's recollection of Manning's response when he first learned about her termination, such testimony is not hearsay, as Colo did not testify to any out-of-court statement made by Manning. Rather, as discussed at length above, such testimony is proper lay witness opinion under Federal Rule of Evidence 701. It was appropriate for Colo to testify to her perception of Manning's emotional state in response to this information.

And second, concerning Manning's discussion of NSA's PTO policy, such testimony is not hearsay, but is a statement made by a party opponent under Federal Rule of Evidence 801(d)(2)(D). *See also Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999 (9th Cir. 2019).

the party." *Weil*, 922 F.3d at 999. "In determining whether the statement concerns a matter within the scope of the employment relationship, the Ninth Circuit has held that 'Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment.'" *Whitcomb v. N. Idaho Coll.*, No. 2:19-CV-392-BLW, 2023 WL 2599211, at *3 (D. Idaho Mar. 22, 2023) (quoting *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986)).

As to Manning's statements contained in the IHRC Determination, Colo asserts that these statements were made in his capacity as an agent or employee of NSA and that these were matters within the scope of his employment as a physician at NSA and Colo's direct supervisor. (Dkt. 93 at 7). The Court agrees.

NSA is correct that Manning "ha[d] no ability to bind NSA concerning matters outside his personal knowledge or outside his role at NSA." (Dkt. 95 at 6). However, as made clear by the IHRC Determination itself, Manning made no statements outside of his personal knowledge or supervisory role at NSA concerning the results of the meeting or Colo's termination. *See* (Ex. 203 at 5 ("When asked about the reason for Colo's termination, Manning stated he was not privy to the discharge.")); *id.* ("[Manning] declined to speculate on the reason for [Colo's] termination.").

Based upon the foregoing, the Court finds that Manning's statements to the IHRC Commissioner are non-hearsay under Federal Rule of Evidence 801(d)(2)(D). His statements constitute admissions by a party opponent in that Manning, at the time the statements were made, was a physician partner of NSA and therefore an agent or

employee of NSA, and his statements were based upon his knowledge, or lack thereof, of Colo's termination—a matter clearly within the scope of his role as Colo's supervisor at NSA. Fed. R. Evid. 801(d)(2)(D). Accordingly, the Court did not err in admitting Manning's statements.

### 3. Equitable Damages – Back and Front Pay

Back pay and front pay are equitable remedies that may be awarded by the Court under Title VII. *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005). Conversely, under the IHRA, recovery of "lost wages," including back pay and front pay, are legal remedies awarded by the trier of fact as an element of actual damages. *Smith v. Glenns Ferry Hwy. Dist.*, 462 P.3d 1147, 1157 (Idaho 2020). The jury, therefore, determines whether to award back pay or front pay damages under the IHRA, and the Court determines any award of back pay or front pay damages under Title VII.

In cases such as this, where there are legal claims to be tried by a jury and equitable claims to be tried by the Court, the jury is often empaneled as an advisory jury on the issue of equitable damages; alternatively, the parties may consent to have the jury decide the issue of equitable damages. *Carlson v. City of Spokane*, No. 13-CV-0320-TOR, 2015 WL 11112412, at *3 (E.D. Wash. Jan. 28, 2015); Fed. R. Civ. P. 39(c).

Here, the parties did not stipulate to have the jury determine the issue of equitable damages. (Tr. 17:10-18:4). Accordingly, the issues of back and front pay were submitted to the jury for an advisory verdict pursuant to Federal Rule of Civil Procedure 39(c)(1).

While Colo asserts that the jury's back pay and front pay awards, as well as the jury's implicit determination that her job search was reasonable and that NSA did not

meet its burden of proof as to mitigation of damages, should be upheld based upon the

Ninth Circuit's holding in *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1196 (9th Cir.

2002) ("Title VII explicitly prohibits limiting state law remedies and … Title VII was not

intended to force plaintiffs to choose among remedial statutes."), this is an incorrect

statement of the law. Rather, the Ninth Circuit has held that when the jury's verdict is

"advisory in nature, 'the court is free to accept or reject the advisory jury's findings, in

whole or in part, and is obligated to make its own independent assessment of the issues

submitted to the advisory jury." *Softketeers, Inc. v. Regal W. Corp.*, No.

819CV00519JWHJDEX, 2022 WL 17968835, at *3 (C.D. Cal. Dec. 22, 2022) (quoting

*Hannibal Pictures, Inc. v. Sonja Prods., LLC*, 2009 WL 10673572, at *1 (C.D. Cal. Aug.

31, 2009), *aff'd*, 432 F. App'x 700 (9th Cir. 2011)); *see also Ashland v. Ling–Temco–*

*Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983) (where a case is tried to the court with

an advisory jury, "[r]eview on appeal is of the findings of the court as if there had been

no verdict from an advisory jury, and there can be no review of supposed errors relating

to rulings before and instructions to the advisory jury." (quoting 9 C. Wright & A. Miller,

*Federal Practice and Procedure* § 2335 (1971)) (alteration in original)). Here, whether

Colo mitigated her damages necessarily concerns her award of back and front pay, which

were submitted to the jury in its advisory capacity. Accordingly, the Court is not bound

by the jury's implicit determination on this issue.

Having carefully reviewed and considered the evidence presented at trial, the

Court sets forth its findings of fact and conclusions of law on the issues of back and front

pay under Title VII and the IHRA for which the advisory verdict was rendered.[14] Fed. R. Civ. P. 52(a). For the reasons that follow, the Court will adopt the jury's back pay award but will decline to adopt the jury's front pay award.

### a. Findings of Fact and Conclusions of Law

#### i. Termination from NSA

As set forth above, the jury determined that Colo was unlawfully discharged on December 6, 2018, in retaliation for informing her coworker, Roberts, that she intended to report the conduct of Montalbano to human resources. (Dkt. 85).

At the time of her termination from NSA, Colo worked as a full-time surgery scheduler for Manning. (Tr. 145:12-15; 595:12-19). In this position, she scheduled surgeries for Manning's patients, (Tr. 188:3-6; 595:14-16); ordered equipment for Manning's surgeries, (Tr. 187:22-24); and reviewed billing and insurance documents, (Tr. 260:12-19).

Colo was terminated on December 6, 2018. (Tr. 165:6-13). In 2018, Colo's wages totaled $63,320.[15] (Ex. 212). NSA contributed to Colo's health insurance, dental

---

[14] The parties also submitted findings of fact and conclusions of law on the issue of whether NSA unlawfully retaliated against Colo. (Dkts. 91, 92-2). Because the jury served in its advisory capacity only with respect to the equitable issues of front and back pay, the Court will not disturb the jury's finding that Colo proved her retaliation claim under Title VII and the IHRA by a preponderance of the evidence. (Dkt. 85). Accordingly, the Court will issue its proposed findings of fact and conclusions of law only with respect to the issues of front and back pay.

[15] The evidence presented with respect to Colo's wages in 2018 is somewhat convoluted. Specifically, NSA asserts that Colo was paid through the end of December 2018 following her termination and that her salary for 2018 was $64,515.14. (Dkt. 92-2 at 6). NSA also asserts, however, that this figure misrepresents her total income in light of the ten-year anniversary bonus she received. (Dkt. 92-1 at 4 n.1 (citing (Ex. 201 at 2))). This bonus amounted to $1,000. (Continued)

insurance, life insurance, and retirement in addition to her salary. (Tr. 151:15-21). In

2018, Colo's benefits totaled $19,530. (Ex. 212); (Tr. 290:8-18; 316:19-25). Colo's total

compensation in 2018 was $82,850. (Ex. 212).

Following Colo's termination, and as part of discovery in the litigation, NSA

discovered emails wherein Colo used disparaging language referring to Manning and

some patients. (Tr. 343:20-345:3; 382:10-383:8). The other employee involved in those

emails still works for NSA. (Tr. 343:20-344:2). While Jolliff testified that NSA planned

"to address these [emails] with [that employee] once we are done with this trial," no

testimony was offered that Colo would have been terminated had those emails been

discovered during her employment. (Tr. 383:3-8).

Based on Colo's work history, plaintiff's expert, Cali Eby ("Eby"), utilized the

Idaho Department of Labor's resources determine how the work Colo performed as a

surgery scheduler at NSA should be classified. (Tr. 294:20-25). Eby, as well as defense

expert Mary Barros-Bailey ("Barros-Bailey") determined that Colo had performed work

---

(Tr. 554:14-18). Colo, on the other hand, asserts her 2018 salary was $65,867.66. (Dkt. 91 at 2 (citing (Ex. 208))). To add to the confusion, Plaintiff's expert Keith Pinkerton ("Pinkerton") testified that Colo received a different amount altogether: "In 2018, in the year of her departure, [Colo] earned an equivalent of $63,320 for the year," an amount which includes her hourly wage and bonus. (Tr. 316:11-18). Pinkerton produced a schedule documenting Colo's anticipated wages between the date after her termination, December 7, 2018 and her retirement at age 63.4. Ex. 212. Pinkerton's schedule indicates Colo should have received an additional $5,444 in wages and benefits between December 7, 2018, and December 31, 2018. (Ex. 212).

Back pay need only be proven with reasonable certainty, which requires "neither absolute assurance nor mathematical exactitude," *see Clear Wireless, LLC v. Mountain State Cellular, Inc.*, No. 1:16-CV-000002-CWD, 2017 WL 10647030, at *14 (D. Idaho Aug. 8, 2017) (quoting *Griffith v. Clear Lakes Trout Co., Inc.*, 152 P.3d 604, 611 (Idaho 2007)). Based upon the evidence presented at trial, the Court will adopt Pinkerton's proposed figures, and concludes that Colo's wages (including bonus) from January 1, 2018, through December 31, 2018, totaled $63,320.

equivalent to an "experienced" medical secretary. (Tr. 283:13-24; 571:4-8). Based upon Colo's experience and education, Eby determined that Colo was likely to earn a salary at the median range of the local labor market, which amounted to $35,630. (Tr. 283:11-24; 285:2-4).

After her termination from NSA, Colo created an account on Indeed.com and began applying for jobs, utilizing the search terms "medical receptionist" and "[f]ront desk receptionist." (Ex. 205); (Tr. 167:13-168:7). Colo applied for jobs as a medical receptionist, front desk receptionist, scheduler, and coordinator. (Tr. 167:16-23). Colo also applied for positions as an administrative medical assistant, patient care coordinator, medical equipment office assistant, insurance specialist, patient financial advocate, office manager, and patient access specialist. (Ex. 205).

### ii. Position at Gustavel Orthopedics

In late 2018, Colo applied for a position at Gustavel Orthopedics in Boise, Idaho, which was scheduled to open on March 11, 2019. (Tr. 171:2-10; 457:6-458:25). Colo testified that she applied for the front desk receptionist position and that it paid between $13 and $15 per hour. (Tr. 171:6-10).

However, Cindy Young, the Office Manager at Gustavel Orthopedics, testified that Colo applied for a medical assistant position there. (457:6-7, 23-25; 458:17-25). Young testified that the medical assistant's job responsibilities included bringing patents back to the exam room, taking their vitals, helping the doctor and the physician's assistant with anything they needed, including supplies, assisting with steroid injections, and helping with bracing. (Tr. 458:19-25).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 38**

Young was unable to recall whether she came across Colo's application by "word of mouth" from one of the physicians at NSA or through Indeed.com. (Tr. 463:5-11). Other evidence suggests that the opportunity with Gustavel Orthopedics was the only job Colo applied for that she received by way of referral from Manning. (Ex. 488 n.3).

The medical assistant position paid between $20 and $22 per hour, (Tr. 456:25-457:5; 459:4-6), and offered health insurance, a 401K with a three-percent employer contribution, two weeks' paid vacation, paid holidays, and a discretionary Christmas bonus between $500 and $1000. (Tr. 459:23-460:16). Young testified that Gustavel Orthopedics was also hiring for a front desk receptionist position at that time that paid $16 per hour and was entitled to the same benefits as the medical assistant position. (Tr. 464:10-15). Young testified, however, that Colo did not apply for the receptionist position. (Tr. 462:24-463:1).

Young testified that in late 2018, Colo accepted the medical assistant position with Gustavel Orthopedics. (Tr. 457:17-22; 459:17-22). Young testified that after accepting the position, Colo completed the health insurance enrollment form for herself and emailed it back to Young, who forwarded it on to Gustavel Orthopedics' benefits enrollment coordinator. (Tr. 464:23-465:2). Based on this correspondence, Young testified that the benefits enrollment coordinator enrolled Colo in Gustavel Orthopedics' health insurance benefits. (Tr. 461:14-21).

Young testified that about three weeks before Gustavel Orthopedics was scheduled to open, Colo contacted her by phone to tell her she could no longer accept their offer of employment because she wanted to be a stay-at-home mother. (Tr. 460:17-23). Young

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 39**

testified that Colo's decision to reject Gustavel Orthopedics' offer of employment after previously accepting left them "in a pinch," noting that they struggled to find a replacement medical assistant. (Tr. 465:20-25).

Colo, however, testified that she never accepted Gustavel Orthopedics' offer of employment; that she merely inquired about the cost of benefits for her three children; and that she told Young she could not accept the position because she could not afford the insurance for her three children or the day care costs that would be required for her to commute to Boise. (Tr. 171:2-23). Moreover, Colo testified the job at Gustavel Orthopedics would have been different from what she had been doing at NSA insofar as she would not be scheduling surgeries for Gustavel as she did for Manning at NSA. (Tr. 171:24-172:5).

Young had no written documentation or records regarding Colo's application. (Tr. 462:8-15). All discussions about the job offer occurred over the phone. (Tr. 465:6-12).

### iii.  Colo's Job Search Activity after Gustavel Orthopedics

After declining the job at Gustavel Orthopedics, Colo continued to apply for jobs. She applied for a total of twenty-one (21) jobs between January 2019 and February 2020. (Ex. 488).

In March 2020, Colo's children left school as a result of the COVID-19 pandemic, and Colo's "primary job became in the home." (Tr. 293:12-23). Eby testified that due to the COVID-19 pandemic, "the labor market just kind of dried up for a period of time where people were not hiring, including medical offices." (Tr. 293:15-23). The unemployment rate during this time jumped from just under 3% to 12.2%. (Tr. 584:8-17).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 40**

Colo began applying for jobs again in September 2020. (Ex. 488). In June 2021, Colo was offered a job as a front desk receptionist at the Medical Center for Colorectal Care. (Tr. 174:17-23); (Ex. 488 n.2). Colo testified that she turned this job offer down, however, because she did not have the experience or training required to help the physician in the exam room when his assistant was out of town. (Tr. 175:2-21).

In late summer or early fall 2021, Colo applied for positions as a dental receptionist, a home health coordinator, and a front desk receptionist for a home health facility. (Tr. 176:6-24).

Colo submitted a total of 57 job applications on Indeed.com between December 2018 and January 2022. (Tr. 289:1-7); (Ex. 488).

Colo began working for her husband's business, Hunter's Choice Taxidermy, in January 2022. (Tr. 168:8-11; 177:2-7). She is paid $10 per hour; she receives no fringe benefits; and her family self-pays for health insurance. (Tr. 168:7-22). Colo is content in her current role. (Tr. 265:16-266:2).

In January 2022, Barros-Bailey performed a job search on Indeed.com that revealed 31 available jobs. (Tr. 568:24-15). These jobs were in the medical field and were based on the "two occupational groups … [of] medical scheduler assistant, [and] medical front office receptionist." (Tr. 569:17-20). Most employers at that time were looking for applicants with one to two years of experience. (Tr. 571:9-21). Barros-Bailey opined that Colo "absolutely met the experience in every single one of these 31 [jobs] because at most [they required] two years [of experience] and [Colo] had ten years." (Tr. 572:2-7).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 41**

In September 2022, Barros-Bailey performed another job search on Indeed.com that revealed 67 available jobs. (Tr. 585:11-24). These jobs were in the medical field and were based on Colo's specific search criteria. (*Id.*) As with the results of Barros-Bailey's January 2022 search, for each of these jobs, the most experience any employer was asking for was two years, while Colo brought ten. (Tr. 586:24-587:2).

### b.  Back Pay

A plaintiff bears the burden of "proving the damages caused her. These damages are determined by 'measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant.'" *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999); *see also Albarmarle Paper Co. v. Moody*, 442 U.S. 405, 421-22 (1975) (holding that employees who have proven employment discrimination are presumptively entitled to back pay). If the plaintiff shows these damages, the court should award back pay. *See Thorne v. City of El Segundo*, 802 F.2d 1131, 1133–34 (9th Cir. 1986).

Back pay awards "advance 'Congress' intent to make "persons whole for injuries suffered through past discrimination."'" *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000), *as amended on denial of reh'g* (Nov. 2, 2000) (quoting *Loeffler v. Frank*, 486 U.S. 549, 558 (1988)). Accordingly, "once a court finds unlawful discrimination, backpay should be denied only if denial 'would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'" *Thorne*, 802 F.2d at

1137 (quoting *Albemarle Paper Co.*, 422 U.S. at 421); *see also Caudle*, 224 F.3d at 1021; *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995).

The jury awarded Colo $300,000 in back pay. (Dkt. 85). Colo asserts the jury's award is supported by the evidence and suggests that the jury arrived at its number by (1) multiplying her total compensation of $81,000 by three for the three years she was unemployed (January 2019 – December 2021) to get $247,673; (2) subtracting the income she received from her job at Hunter's Choice Taxidermy in 2022, $15,600 (January 2022 – September 2022), from the amount she would have received from NSA during that time frame, $60,750, to arrive at $45,150; and (3) adding those two numbers together, for a total of $288,150. (Dkt. 91 at 7).

Based upon the jury's verdict in Colo's favor and the supporting evidence presented at trial, the Court finds no reason to depart from the jury's award of back pay in the amount of $300,000.

At trial, Colo presented evidence of her back pay damages, relying on her own testimony, the expert testimony of Eby and Pinkerton, as well as exhibits admitted during trial documenting the wages, bonuses, and benefits Colo received throughout her employment at NSA. Among these exhibits was a schedule produced by Pinkerton detailing the wages and benefits Colo would have received from the time of her termination through retirement at age 63.4. (Ex. 212). Colo testified she was earning $11.00 per hour at the time her employment was terminated in December 2018. However, her wages were much higher after her discretionary bonus, Christmas bonus, and anniversary bonus were factored in.

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 43**

In 2018, Colo received wages in the amount $63,320 and benefits in the amount of $19,530. (Ex. 212). Pinkerton determined that in 2018, Colo would have received total compensation in the amount of $82,850. (Ex. 212). This amount includes the remaining wages and benefits she would have received from NSA in 2018 between December 7, 2018, and December 31, 2018, totaling $5,444.[16] (Ex. 212).

Pinkerton also accounted for a consistent increase in Colo's wages and benefits year over year through retirement. (Tr. 321:25-322:7). This increase appears to comport with her annual compensation from 2015, 2016, 2017 and 2018. (Ex. 208). Applying this increase to Colo's 2018 wages and benefits from the time of her termination through the last date of trial, Pinkerton projected that Colo would have received compensation from NSA in the following amounts:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $85,957 |
| 2020 | $88,303 |
| 2021 | $93,796 |
| 2022 | 97,772 |

(Ex. 212).

---

[16] Pinkerton testified that the remaining $5,444 she was entitled to in 2018 should have been reduced by 37.1%. This reduction was applied over the lifetime of Colo's award (both back pay and front pay) to account for future periodic absences from the workforce. (Tr. 326:3-327:17). The Court, sitting in equity, will decline to reduce Colo's back pay award based upon her anticipated periodic absences from the workforce.

Although Colo accepted employment with her husband's taxidermy business in 2022 making $10.00 per hour,[17] Pinkerton predicted, based on Eby's expert report, that if Colo had obtained a substantially equivalent position as a full-time surgery scheduler in the medical field, she would have received $35,360 in wages and $7,162 in benefits. (Ex. 212). As such, her total compensation in 2022 would have totaled $42,522. (Ex. 212).

The Court, sitting in equity, will accept Pinkerton's calculations and will reduce the amount she would have received from NSA in 2022 ($97,772) by the amount she would have earned in a comparable position ($42,522). This equals $55,250. Because the calculation of Colo's back pay award runs from the date of her termination, December 7, 2018, through the last day of trial, September 30, 2022, the amount she would have received in 2022 must be reduced by 25%. Thus, the Court finds that Colo would be entitled to total compensation for 2022 in the amount of $41,438.

These amounts, taken together, equate to just over $300,000,[18] which is consistent with the jury's back pay award at trial. (Dkt. 85). Accordingly, the Court finds that the

---

[17] Based upon this evidence, using a multiplier of 40 hours per week and 52 weeks per year (2080), her total compensation for 2022 at Hunter's Choice Taxidermy would have equaled $20,800.

[18] The calculation of Colo's total compensation between December 7, 2018, and September 30, 2022, based on Pinkerton's schedule, (Ex. 212), is produced below:

| Year | Amount |
|------|--------|
| 2018 | $5,444 (between December 7, 2018, and December 31, 2018) |
| 2019 | $85,957 |
| 2020 | $88,303 |

(Continued)

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 45**

jury's back pay award is supported by a preponderance of the evidence in the record and satisfies the equitable purpose of back pay: to make the plaintiff whole. *See Thorne*, 802 F.2d at 1137. For these reasons, the Court will adopt the jury's findings and advisory verdict regarding back pay as its own.[19]

### i. Failure to Mitigate Damages

A plaintiff seeking an award of back or front pay has a duty to mitigate damages by making reasonably diligent efforts to obtain alternative employment. *Caudle*, 224 F.3d at 1020 (citing 42 U.S.C. § 2000e-5(g)(1)). At trial, NSA raised the affirmative defense of failure to mitigate damages.

NSA has the burden of proving that Colo failed to mitigate her damages. *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980). To meet this burden, NSA must prove "(1) that the damages suffered by plaintiff could have been avoided, *i.e.*, that there were suitable positions available which plaintiff could have discovered and for which [she] was qualified; and (2) that the plaintiff failed to use reasonable care and diligence in seeking such a position." *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978). "Substantially equivalent employment is employment which affords

| 2021 | $93,796 |
|------|---------|
| 2022 | $41,438 (75% of $55,250) |
| **Total:** | **$314,938** |

[19] This comports with Federal Rule of Civil Procedure 52 and serves as the Court's findings of fact and conclusions of law for matters tried with an advisory jury on the issue of back pay.

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 46**

virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status … ." *Hutchins v. DirecTV Customer Serv., Inc.*, No. 1:11-CV-422-REB, 2014 WL 3572045, at *20 (D. Idaho July 21, 2014) (quoting *Lyle v. Desert Springs Hosp.*, 2012 WL 6562033, *6 (D. Nev. Dec. 14, 2012)).

At trial, NSA did not meet its burden of establishing that Colo failed to mitigate her damages. Specifically, NSA did not put on ultimately persuasive evidence that there were "suitable positions available which plaintiff could have discovered and for which [she] was qualified." First, considering the job at Gustavel Orthopedics, while NSA put on evidence that Colo applied for and accepted the medical assistant position that offered her "virtually identical" promotional opportunities, compensation, job opportunities and status, the medical assistant position's job responsibilities were not comparable to those she performed as a surgery scheduler for Manning at NSA. Accordingly, the medical assistant position NSA claims Colo accepted could not have been substantially equivalent to her role at NSA. Colo therefore did not fail to mitigate her damages by declining to accept this position. Second, as to the job at the Medical Center for Colorectal Care, NSA also failed to present evidence that the position was "virtually identical" in each of the foregoing respects to her role at NSA. *See Hutchins*, 2014 WL 3572045, at *20. Indeed, NSA presented no evidence regarding the position's promotional opportunities, compensation, or job responsibilities. As such, the Court cannot find that this position was substantially equivalent to her role at NSA either. And third, while NSA pointed to evidence tending to suggest that Colo failed to use reasonable care and diligence in seeking a suitable position between December 7, 2018, and the time of trial, NSA

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 47**

altogether failed to present evidence of suitable positions Colo could have obtained between January 2019 and December 2021. Indeed, the only time periods for which NSA produced evidence of available positions were January 2022 and September 2022. Not only was Colo already employed at those times, but Colo, who had over ten years of experience at NSA, was overqualified for each of those roles, which required a maximum of only two years of experience. (Tr. 569:4-25; 582:22-583:11; 587:23-588:4). Ultimately, without proof of what comparable employment was available to Colo between the date of her termination and the date of trial, NSA cannot prevail on this defense. *Siegel v. Edmark Auto Inc.*, No. 1:09-CV-00443-CWD, 2011 WL 3439937, at *18 (D. Idaho Aug. 8, 2011) ("An employee's failure to look for work is not an exception to the general rule that the employer must present evidence as to the availability of comparable employment." (citing *Odima*, 53 F.3d at 1497)). Accordingly, the Court finds that NSA has not met its burden of proving by a preponderance of the evidence that Colo failed to mitigate her damages.

### ii.  Voluntary Withdrawal from the Workforce

NSA also contends that Colo's back pay award should be reduced based on her decision to voluntarily withdraw from the workforce. First, NSA asserts that Colo is entitled to compensation for only forty-eight (48) days of unemployment, from January 1, 2019, through mid-February 2019, due to the fact that she rejected the job offer she received from Gustavel Orthopedics and effactually withdrew from the workforce. (Dkt. 92-1 at 5). As such, NSA asserts that Colo's back pay award should be reduced to $8,064.39. (*Id.*) In the alternative, if the Court finds that Colo did not withdraw from the

workforce in February 2019, NSA asserts that the Court must find that she withdrew

from the workforce in March 2020 due to her decision to stay home with her children

during the COVID-19 pandemic. (Dkt. 92-1 at 12). In that case, NSA asserts that Colo

would be entitled to $80,643.93 in back pay. (Dkt. 92-1 at 12 n.4).

A plaintiff removes herself from the labor market when she is not "ready, willing

and legally capable of performing alternate work at the commencement and through the

backpay period." *Rivera v. NIBCO, Inc.*, 384 F.3d 822, 832 (9th Cir. 2004).

At trial, NSA presented evidence that after accepting the Medical Assistant

position at Gustavel Orthopedics, Colo called Young to withdraw her acceptance because

she wanted to be a stay-at-home mother. Colo, however, testified that she never accepted

the position and ultimately called Young to reject the position at Gustavel Orthopedics

because her three dependents would not be covered under their health insurance plan and

the "day care cost from driving to Boise" was prohibitive. (Tr. 171:14-15).

Despite this conflicting testimony, the Court finds NSA has not ultimately met its

burden of proving by a preponderance of the evidence that Colo withdrew from the job

market in February 2019. Based upon (1) the lack of documented evidence regarding

Colo's alleged acceptance of the medical assistant position; (2) the fact that Colo was not

qualified for the medical assistant position for which Young insists she applied; and (3)

the fact that Colo continued to apply for jobs between January 2019 and March 2019—

the exact timeframe within which she is alleged to have accepted the role at Gustavel

Orthopedics; the Court is not persuaded that Colo, more probably than not, rejected the

job offer to be a stay-at-home mother. Given that Young's testimony is the only evidence

NSA presented on this issue, the Court is not persuaded by a preponderance of the evidence that Colo withdrew from the workforce in February 2019.

The Court finds the same to be true of NSA's assertion that Colo withdrew from the workforce in 2020 due to the COVID-19 pandemic. The evidence suggests that if Colo did withdraw, any withdrawal was temporary due to the fact that her children were forced to withdraw from in-person attendance at school as a result of the COVID-19 pandemic. Moreover, the high unemployment rate between April 2020 and May 2021 indicates that there were few, if any, substantially equivalent jobs available during that time. In *Caudle*, the Ninth Circuit noted Plaintiff's decision to withdraw from the workforce to care for her child after giving birth was "not only uncompelled by her situation but also unaffected by the defendant's discriminatory behavior." *Caudle*, 224 F.3d at 1020. The same cannot be said of Colo. In the instant case, Colo was already out of work in March 2020 due to NSA's retaliatory behavior, and her decision to care for her children when they were forced to withdraw from in-person attendance at school was, in fact, compelled by her situation (her unlawful termination from NSA) and circumstances beyond her control (the COVID-19 pandemic). The Court, sitting in equity, will not penalize Colo for fulfilling her obligation to care for her children during such an uncertain time, particularly where there was credible testimony that the labor market "dried up" and the unemployment rate jumped to 12.2%. Moreover, as Colo correctly points out, NSA has failed to demonstrate that there were any suitable positions available for her to accept at that time. *See Siegel*, 2011 WL 3439937, at *18.

As the finder of fact on the issue of equitable damages, and after reviewing the evidence and hearing the testimony of each witness during the five-day jury trial, the Court finds NSA has not met its burden of proving Colo withdrew from the workforce by a preponderance of the evidence. Accordingly, the jury's back pay award of $300,000 will stand.

### iii.  Prejudgment Interest

Although neither party has briefed the issue, "[a]n award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir.1984). While the interest rate used to calculate prejudgment interest is within the discretion of the trial judge, *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984), "[g]enerally, the interest rate prescribed for post judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007).

The Court finds no reason to depart from the statutory rate prescribed by 28 U.S.C. § 1961. Accordingly, Colo is entitled to a back pay award of $300,000, plus prejudgment interest at the rate prescribed by 28 U.S.C. § 1961.

### c.  Front Pay

"Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 51**

great that reinstatement is not appropriate." *Caudle*, 224 F.3d at 1020 (quoting *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir.1984), *overruled on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (alteration original)).

A plaintiff seeking an award of front pay has a duty to mitigate damages by making reasonably diligent efforts to obtain alternative employment. *Caudle*, 224 F.3d at 1020 (citing 42 U.S.C. § 2000e-5(g)(1)). Regarding front pay, the Ninth Circuit has observed:

> A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future. "[F]ront pay awards ... must be reduced by the amount plaintiff could earn using reasonable mitigation efforts.... Thus, front pay is intended to be temporary in nature. An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing." *Cassino*, 817 F.2d at 1347 (citations and quotations omitted). "Because of the potential for windfall, [front pay] use must be tempered." *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)."

*Gotthardt*, 191 F.3d at 1157; *see also Boehm v. American Broadcasting Co., Inc.*, 929 F.2d 482, 488 (9th Cir.1991) (noting that 6-year front pay period "is longer than customary in federal discrimination actions, [but] it is not so unsound as to warrant reversal"). Given the animosity between Colo and NSA, the Court finds that reinstatement would be inappropriate. Accordingly, the Court will look to front pay as an alternative remedy.

At trial, Pinkerton testified that Colo was entitled to $870,064 in future lost wages,[20] and he identified lost social security income at $293,942. (Tr. 318:1-320:25).

---

[20] Pinkerton's schedule indicates Colo's future lost wages, reduced to present value, through age 63.4 would have totaled $969,146. (Ex. 212).

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 52**

Colo's future losses were calculated through retirement at age 63.4, reduced to present value, and discounted based on period absences from the workforce.[21] (Ex. 212).

After hearing all the evidence, the jury awarded Colo $1,350,000 in front pay relief. (Dkt. 85). The Court, however, sitting in equity, finds that the front pay period determined by the jury, which spans over 31 years, is entirely too speculative. *See Malone v. Potter*, No. CV 07-05530 MMM FFMX, 2010 WL 330252, at *13 (C.D. Cal. Jan. 15, 2010) ("[C]ourts have noted that '[t]he longer a proposed front pay period, the more speculative the damages become.'" (quoting *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002))); *see also Jung v. Potter*, No. CV04-429-PHX-MHM, 2008 WL 2620905, at *3 (D. Ariz. July 1, 2008) ("Numerous other courts have acknowledged that it is rare that a person in his 40's would be awarded front pay until retirement age." (citing cases)). Accordingly, the Court will exercise its discretion and will award Colo 2.25 years of front pay, from October 1, 2022, through December 31, 2024, in the amount of $130,333, based on the figures contained in Pinkerton's schedule.[22] (Ex. 212).

---

[21] As with her back pay award, *see infra* note 16, Pinkerton's front pay award also contemplates a 37.1% discount for periodic absences from the workforce in the future. (Tr. 326:3-327:17). Because the Court is limiting Colo's front pay to 2.25 years, the Court, in equity, will decline to reduce this award based upon future absences from the workforce.

[22] The calculation of Colo's lost wages between October 1, 2022 and December 31, 2024, is based upon the difference between what she would have received had she remained employed at NSA and what she would have received after obtaining substantially equivalent employment elsewhere. The calculation of Colo's front pay, based on Pinkerton's schedule, (Ex. 212), is produced below:

| Year | Amount |
|------|--------|
| 2022 | $13,812 (between October 1, 2022, and December 31, 2022) |

(Continued)

**MEMORANDUM DECISION AND ORDER; FINDINGS OF FACT AND CONCLUSIONS OF LAW – 53**

The Court finds a reduced award to be appropriate for three reasons. First, the extravagant front pay award awarded by the jury, which essentially awards Colo front pay until retirement, runs counter to the general rule that "front pay is intended be temporary in nature." *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987). Second, given the speculative nature of such a lengthy front pay period, awarding Colo front pay until retirement would clearly constitute a windfall. And third, a reduced award is justified given Colo's young age, training, and experience at the time the unlawful retaliation occurred.

Because Colo received back pay for a period of 3.75 years, the Court finds an additional 2.25 years of front pay will give her roughly six years to mitigate her damages. The Court finds this to be adequate. *See, e.g.*, *Erickson v. Biogen, Inc.*, No. C18-1029-JCC, 2020 WL 885743, at *4 (W.D. Wash. Feb. 24, 2020) (remitting front pay award to three years in WLAD and Title VII case); *Rookaird v. Bnsf Ry. Co.*, No. C14-176RSL, 2016 WL 8260464, at *9 (W.D. Wash. Sept. 2, 2016), *aff'd in part, vacated in part, remanded*, 908 F.3d 451 (9th Cir. 2018) (reducing front pay award to two years).

Accordingly, the Court will award Colo front pay in the amount of $130,333.

## CONCLUSION

In sum, the Court finds that NSA has not carried its burden of demonstrating that the evidence presented at trial could result in "only one reasonable conclusion, and that

| | |
|---|---|
| 2023 | $57,284 |
| 2024 | $59,237 |
| **Total:** | **$130,333** |

conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). Neither has NSA demonstrated that the admissions of the IHRC Determination and Manning's testimony were erroneous or resulted in an "attendant miscarriage of justice." *Gates*, 2007 WL 9710298, at *1.

In accordance with the jury's verdict, final judgment will be entered in favor of Colo on her retaliation claim under Title VII and the IHRA. Based on the verdict and the Court's findings of fact in regard to back pay under Title VII and the IHRA, judgment in the amount of $300,000, plus prejudgment interest is appropriate. In the exercise of its discretion, the Court will also award $130,333 in front pay, consistent with the evidence presented at trial.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED that:**

1. Defendant's Renewed Motion for Directed Verdict (Dkt. 89) is **DENIED**.

2. Defendant's Motion for New Trial (Dkt. 89-4) is **DENIED**.

3. The Court will enter a separate judgment consistent with this Order.

DATED: June 15, 2023

Honorable Debora K. Grasham
United States Magistrate Judge